UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHIRLEY BURRIS,

                          Plaintiff,

         - against -

HOUSING AND SERVICES INC., ET AL.,

                       Defendants.

17-cv-9289 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Shirley Burris, brought this action against the defendants, Housing and Services, Inc. ("HSI"), Sara Stolfi, James Dill, and Ethan Jamron, alleging various federal and state law claims arising out of the plaintiff's eviction and subsequent related proceedings. The plaintiff initially proceeded pro se but is now represented by counsel. In a Memorandum Opinion and Order dated March 18, 2019, this Court dismissed most of the plaintiff's federal and state law claims and dismissed two individual defendants, Dill and Jamron, from this case, but did not dismiss the plaintiff's claims of discrimination and retaliation against HSI and Stolfi in violation of the Americans with Disabilities Act ("ADA), 42 U.S.C. § 12101 et seq., the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., and the Rehabilitation Act, 29 U.S.C. § 701 et seq. Burris v. Hous. & Servs. Inc., No. 17-cv-9289, 2019 WL 1244494, at *9 (S.D.N.Y. Mar. 18, 2019). The defendants now move

for summary judgment pursuant to Federal Rule of Civil Procedure 56 seeking dismissal of those remaining claims. For the following reasons, the defendants' motion for summary judgment is **granted in part and denied in part.**

I.

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted. See Defendants' Rule 56.1 Statement, ECF No. 106 ("Defs.' 56.1"); Plaintiff's Rule 56.1 Counterstatement, ECF No. 113 ("Pl.'s 56.1").

HSI is a non-profit agency that provides "scatter-site housing to individuals and families with an HIV diagnosis." Defs.' 56.1 ¶ 1. Those individuals are referred to HSI by the New York City Human Resources Administration ("HRA") through its HIV/AIDS Services Administration ("HASA") program. Id. HSI contracted with HRA to administer a "permanent scatter-site supporting housing program for Persons Living With AIDS (hereinafter "PLWAs") by operating 100 scatter-site housing units for clients referred by HASA." Id. ¶ 2. The contract between HSI and HRA "sets forth the duties and obligations of the parties with respect to HSI's provision of scatter-site housing services." Id. ¶ 3. HRA and HASA's Housing Services Unit issue a "Desk Guide for its Supported Housing Programs" in order

to provide further guidance to housing providers with whom HRA and HASA have contracted. Id. ¶ 5; see also ECF No. 104-2 ("Desk Guide").

Stolfi is the Program Manager of HSI's Scatter Site I Housing Program, and is responsible for "oversight of the program, supervision of staff, mediat[ion] [of] any issues that may come up with[in] the program and provi[sion] [of] some direct services as well." Defs.' 56.1 ¶ 6.

To qualify for an HSI-provided housing unit, individuals approved for HASA services must apply for housing in HASA's "Permanent Supported Housing Program." Id. ¶ 7. The individual must be a client of HRA's HASA Program, be referred by the HASA Housing Unit, need supportive housing services, and be able to function independently and self-sufficiently, both socially and financially. Id. ¶ 8. Once an individual is approved for the Permanent Supported Housing Program, the Housing Unit links that individual to an available housing unit vacancy by referring the client's application to a contracted housing provider. Id. ¶ 9. HSI, a contracted provider, leases the apartments that are part of its scatter-site housing program in its own name to allow individuals and families to remain anonymous, and "pays the rent for the units it leases" while seeking reimbursement from HRA/HASA for its portion of rent paid. Id. ¶ 10-11.

After HSI contracted with HRA/HASA, HSI took over the lease for a New York City apartment (the "132 Street Apartment") "for occupancy by an eligible HASA client." Id. ¶ 12. In June 2012, HASA referred "AB," a program participant, to HSI for housing assistance, and HSI subleased the 132 Street Apartment to AB. Id. ¶¶ 13-14. AB was joined in the apartment by the plaintiff and the plaintiff's minor child. Id. ¶ 15. HSI subleased the apartment to AB from June 2012 to August 2016. Id. ¶ 16. HSI leased three other apartments in the same building during that time period, but in 2016, HSI began vacating all four units that it leased in the building. Id. ¶ 17. The leases were not rent-stabilized, and "over the years, the building raised rents 'very significantly.'" Id. ¶ 18.

On April 10, 2015, HSI "entered its final lease for" the 132 Street Apartment, from June 1, 2015 to May 31, 2016. Id. ¶ 19. The plaintiff disputes this, responding that "after May 31, 2016, HSI continued to lease the apartment . . . on a month-to-month basis." Pl.'s 56.1 ¶ 19. HSI contacted AB to discuss relocation options, "including whether [AB, the plaintiff, and the plaintiff's child] were going to move together as a family unit or move separately." Defs.' 56.1 ¶ 20. HSI suggested to AB an apartment in the Bronx that was available for lease under the HASA program and that could house AB, the plaintiff, and the plaintiff's child. The plaintiff wanted HSI to move AB out of

4

the 132 Street Apartment while allowing the plaintiff and her son to remain in that apartment, but was told that HSI could not do so because the plaintiff did not qualify for HASA. Id. ¶¶ 21-22. Neither the plaintiff nor the plaintiff's child are HASA program participants, nor are they eligible to be participants because they are not PLWAs. Id. ¶ 23.

On June 27, 2016, while the plaintiff and her son were still living with AB, the plaintiff filed a complaint ("NYSDHR Complaint") in the New York State Division of Human Rights ("NYSDHR"). Id. ¶ 25. In the NYSDHR Complaint, the plaintiff claimed that HSI "refused to rent, sell or deal with" the plaintiff and therefore "discriminated in the conditions or terms of sale, rental occupancy, or in services or facilities due to her family status." Id. ¶ 29.

The plaintiff requested housing assistance from HSI, claiming that AB's "behavior can get out of control," but was told that HSI could not help her relocate from AB because the plaintiff was not an HASA client. Pl.'s 56.1 ¶ 26. The plaintiff wanted to rent another apartment in the same building, but Jamron, the building's Property Manager, allegedly "did not give her an application and told [the] [p]laintiff she could not have the keys." Defs.' 56.1 ¶ 27. The plaintiff disputes this, citing her testimony that when she spoke to Jamron, he told the plaintiff that he "was waiting to get the keys back . . . for

the apartments that were empty downstairs in the basement, and he will get back to me. I left messages after he told me that. He never returned my call." Pl.'s 56.1 ¶ 27.

On July 26, 2015, the plaintiff filed a temporary order of protection against AB. Defs.' 56.1 ¶ 30. After the order was issued, AB told HSI that she wanted to move out of the 132 Street Apartment on her own, without the plaintiff. Id. ¶ 31.

On August 3, 2016, HSI responded to the NYSDHR Complaint, "explaining that AB was in the process of relocating to another unit within HSI's scatter site program," and that because AB "was choosing to separate her public assistance case and move as an individual without" the plaintiff, the plaintiff and her son did not qualify for HASA housing assistance and HSI could not help the plaintiff and her son relocate. Id. ¶ 32.

On August 18, 2016, AB moved out of the 132 Street Apartment. Id. ¶ 33. HSI then relocated AB to another apartment on 139 Street (the "139 Street Apartment"). Id. ¶ 34. The plaintiff and her son remained in the 132 Street Apartment. Id. ¶ 35.

After AB moved out of the 132 Street Apartment, the plaintiff called AB, and AB later returned her call informing the plaintiff that Stolfi "gave [AB] a packet to give to [the plaintiff]." Id. ¶ 36. The packet contained "resources for rental assistance, including information on" several rental

assistance programs, and a note to the plaintiff to "Call [Stolfi] if you have any questions." Id. ¶ 37. The plaintiff did not call Stolfi. Id. ¶ 44. The plaintiff alleges that she did not call Stolfi because the plaintiff "was scared of her." Pl.'s 56.1 ¶ 44. The plaintiff claims that she "was scared to speak to the agency because they did nothing to help [her] out" and that when the plaintiff "got the paperwork from the courts, [she] did reach out to [Stolfi]," and left Stolfi a message, but "[Stolfi] never returned [the plaintiff's] call." Id.

HSI contends that it only provides housing assistance for families through its Scatter Site Program under HASA, and because the plaintiff and her son sought housing as a family and were not HASA-eligible, "they did not qualify for any programs administered by HSI." Defs.' 56.1 ¶ 38. The plaintiff disputes this, claiming that "as family members on the budget of a HASA client, [the plaintiff] and her child qualified for rehousing assistance" as required by the Desk Guide, which provides that HSI must "aggressively work toward rehousing non-HASA eligible individuals" and "must assist individual(s) to move, within six months of client's death/departure, either by having the lease assigned from [HSI]'s Program to the individual him/herself . . . or seeking alternate housing at a rent the individual can afford." Pl.'s 56.1 ¶ 38; ECF No. 104-2.

HSI states that, under its contract with HRA, "its case
management services includ[e] providing various referrals as
opposed to direct services." Defs.' 56.1 ¶ 39. Because HSI does
not have in-house services, such as "mental health counseling,
psychiatric treatment, legal services or substance abuse
counseling," HSI would instead connect its clients with other
community organizations that provide those services. Id. ¶ 40.
HSI states that "[t]his is equally true of housing placement
services," because "HSI does not have access to housing outside
of its programs, nor [does it] have in-house housing search
services or access to housing search programs." Id. ¶ 41.
Instead, HSI "would refer individuals to community organizations
with expertise in the area locating housing," but was not
otherwise "familiar with [the] various resources identified in
the packet provided to [the] [p]laintiff, rendering HSI unable
to provide additional assistance." Id. ¶ 42.

On August 30, 2016, HSI served the plaintiff with a "10-Day
Notice to Vacate Premises." Id. ¶ 45. On August 31, 2016, HSI
sent HRA/HASA a report stating that AB had relocated from the
132 Street Apartment to the 139 Street Apartment "due to family
conflict and landlord issues," that "AB's daughter and grandson
remain at the [132 Street Apartment] and were provided referrals
to family housing programs," and that "HSI has started an
eviction process against [the plaintiff and her son] due to

8

their apparent plan to remain in the" 132 Street Apartment. Id.
¶ 46. The plaintiff did not vacate the apartment after receiving
the 10-Day Notice. Id. ¶ 47.

On September 22, 2016, HSI began a "licensee holdover
proceeding" by serving on the plaintiff a "Notice of Petition
and Petition." Id. ¶ 47. During the holdover proceeding, the
plaintiff stated, through an attorney for Manhattan Legal
Services, that "she and her son were eligible to remain in the
unit" and that she qualified to be in the building. Id. ¶ 48-50.
The defendants claim that the plaintiff "never once spoke to the
landlord about leasing the [132 Street Apartment] herself," id.
¶ 51, but the plaintiff disputes this, alleging that Jamron
"didn't return my call," and Stolfi "told me I could not be in
the unit because I was not a HASA client." Pl.'s 56.1 ¶ 51.
Around September or October 2016, Stolfi told the plaintiff by
phone that the plaintiff did not qualify to stay in the
apartment, which the defendants contend that the plaintiff
acknowledged. The plaintiff disputes this, claiming that she had
called and left multiple messages for Stolfi, but Stolfi had
never returned her calls. Pl.'s 56.1 ¶ 53.

In November 2016, the plaintiff applied for Section 8
housing through NYCHA with the assistance of Harlem Independent
Living Center, for which the plaintiff is still on the waiting

list. Id. ¶¶ 54-56. The plaintiff also applied for an apartment in a building called "The Balton." Defs.' 56.1 ¶ 57.

Unlike HSI, Harlem Independent Living Center "was approved to submit supportive housing applications to HRA." Id. ¶ 58. The plaintiff began "the process of submitting a supportive housing application with Harlem Independent Living Center but could not recall whether she ever completed the process." Id. ¶ 60.

In November 2016, the plaintiff contacted the New York City Department of Health & Mental Hygiene for housing assistance and was put in touch with "Visiting Nurse Services Care Coordination." Id. ¶ 61. On December 2, 2016, the plaintiff enrolled in the "Visiting Nurse Service of New York Health Home" and was assigned a Care Manager who assisted the plaintiff with her housing needs. Id. ¶ 62. The Visiting Nurse Service of New York also helped the plaintiff to complete her supportive housing application. However, the plaintiff "could not recall whether that application was ever completed or submitted." Id. ¶ 63.

The plaintiff also contacted other agencies for assistance. Id. ¶¶ 64-66. While the plaintiff was seeking housing assistance from those other agencies, the plaintiff "was still advocating to remain" in the 132 Street Apartment. Id. ¶ 68.

On April 27, 2017, the parties reached a settlement in the holdover proceeding, which provided that the plaintiff agreed to

vacate the 132 Street Apartment by September 30, 2017. Id. ¶ 69.
In May 2017, HSI sent the plaintiff a letter with information
about "NYC housing assistance resources available for low-income
families" and offered "to assist [the plaintiff] with pursuing
this resource for rehousing as soon as possible." Id. ¶ 70. The
letter included a list of brokers, realtors, and landlords
prepared by the HRA to help clients find apartments. On August
9, 2017, HSI sent a second letter to the plaintiff, which was
returned to HSI as "Unclaimed" and "Unable To Forward." Id. ¶
72.

On May 16, 2017, HRA asked Stolfi about the status of the
132 Street Apartment, including why it was listed as "in
transition." Id. ¶ 75. Stolfi responded:

> This apartment was previously occupied by AB, who was
> transferred to another unit and then to our congregate program
> because of a potentially violent and volatile situation
> between her and her adult daughter in the home and her need
> for a higher level of care. Her adult daughter and grandson
> remain in the apartment and have refused to move despite our
> efforts to refer her for family housing. We have been involved
> in a lengthy housing court case to move them along ever since,
> which she has fought all along the way. We finally were able
> to get a stipulation for the family to move out by 9/30/17.

Id. ¶ 76. HRA/HASA then asked about HSI's efforts to relocate
the plaintiff and her son, to which HSI responded that "it no
longer had a lease for" the 132 Street Apartment and that "the
building owner did not want to lease directly to [the
plaintiff]." Id. ¶ 77-78. HSI also told HRA/HASA that it had

11

provided the plaintiff with a broker list and sent the plaintiff two letters with information on rental assistance programs. HRA continued to reimburse HSI for the rents that HSI paid on the 132 Street Apartment while the plaintiff and her son lived there, pending their relocation "by eviction or otherwise." Id. ¶ 82. HRA "advised HSI of its expectation" that HSI would evict non-HASA clients after the departure of an HASA client from an apartment if the family members of that client "do not demonstrate an intention to vacate the unit, for example by pursuing the referrals provided by [HSI]." Id. ¶ 83.

On November 22, 2017, the plaintiff filed this action. On June 29, 2018, the plaintiff filed an amended complaint. ECF No. 36. The defendants moved to dismiss the amended complaint, which motion was granted in part and denied in part. ECF No. 60. On May 2, 2022, the parties completed discovery, and the defendants filed the current motion for summary judgment shortly thereafter.

The plaintiff argues that HSI was required to provide her with more substantial relocation assistance, but failed to do so because of her disability, and therefore discriminated against her in violation of the ADA, the Rehabilitation Act, and the FHA. The plaintiff also argues that the defendants retaliated against her for filing a complaint of discrimination with the NYSDHR, in violation of those same statutes.

12

## II.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).[1] At the summary judgment stage, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

13

motion are not credible." Ying Jing Gan v. City of New York, 996
F.2d 522, 532 (2d Cir. 1993).

III.

The plaintiff brings claims for discrimination on the basis
of disability in violation of the ADA, the Rehabilitation Act,
and the FHA. On a motion for summary judgment, claims for
intentional discrimination under the ADA, the Rehabilitation
Act, and the FHA are analyzed under the familiar McDonnell
Douglas burden-shifting framework. See Reg'l Econ. Cmty. Action
Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir.
2002), superseded by statute on other grounds, ADA Amendments of
2008, Pub. L. No. 110-325, 122 Stat. 3553. Under the McDonnell
Douglas framework, the plaintiff must first establish a prima
facie case of discrimination. Id.; see also McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 802 (1973). "If the plaintiff[]
make[s] out a prima facie case, then the burden of production
shifts to the defendant to provide a legitimate,
nondiscriminatory reason for its decision. Reg'l Econ. Cmty.
Action Program, 294 F.3d at 49. If the defendant satisfies this
burden, then the burden shifts back to the plaintiff to show
that the defendant's "articulated, legitimate, non-
discriminatory reasons were pretextual." Id.

**A.**

The defendants argue that HSI is not a public entity within the meaning of the ADA and therefore is not subject to the ADA. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To bring a claim under Title II of the ADA, the plaintiff must show that: (1) she is a qualified individual with a disability, (2) the defendants are subject to the ADA, and (3) she was denied the opportunity to participate in or benefit from the defendants' services or was otherwise discriminated against by the defendants because of her disability. Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

The plaintiff does not dispute that HSI is not a public entity within the meaning of the ADA. Pl.'s Opp., ECF No. 112, at 3 n.1. Therefore, the plaintiff's ADA claims are **dismissed** because the defendants are not subject to Section 12132 of the ADA.

**B.**

The defendants next move for summary judgment on the plaintiff's claim of discrimination under the Rehabilitation Act. Individuals cannot be held liable under the Rehabilitation

Act. See J.L. on behalf of J.P. v. N.Y.C. Dep't of Educ., 324 F.
Supp. 3d 455, 467 n.4 (S.D.N.Y. 2018). Accordingly, the
plaintiff's Rehabilitation Act claims can only be asserted
against HSI.

Section 504 of the Rehabilitation Act provides that "[n]o
otherwise qualified individual with a disability . . . shall,
solely by reason of her or his disability, be excluded from the
participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal
financial assistance." 29 U.S.C. § 794(a). The standard for
Rehabilitation Act claims is "generally the same" as for ADA
claims, and requires the plaintiff to show that (1) she is a
qualified individual with a disability, (2) the defendant is
subject to the Rehabilitation Act, (3) she was denied the
opportunity to participate in or benefit from the defendant's
services or was otherwise discriminated against by the defendant
because of her disability, and (4) the defendant receives
federal funding. See Shomo v. City of New York, 579 F.3d 176,
185 (2d Cir. 2009); see also Henrietta D., 331 F.3d at 272
("[U]nless one of those subtle distinctions [between the ADA and
the Rehabilitation Act] is pertinent to a particular case, we
treat claims under the same two statutes identically.").[2] On a

_____

[2] In this case, although the defendants argue that HSI is
not a public entity within the meaning of the ADA, the

motion for summary judgment, the plaintiff's burden to establish her prima facie case is de minimis. See Duprey v. Prudential Ins. Co. of Am., 910 F. Supp. 879, 884 (N.D.N.Y. 1996); Schneider v. Wal-Mart Stores, Inc., No. 16-cv-2010, 2019 WL 294309, at *4 (S.D.N.Y. Jan. 23, 2019). HSI does not claim that it is not subject to the Rehabilitation Act or contest that the plaintiff's mental illness qualifies her as an individual with a disability. The parties contest only whether the plaintiff was denied the opportunity to benefit from HSI's services on the basis of the plaintiff's mental illness.

The plaintiff argues that HSI discriminated against her based on her mental illness by not following an HASA policy, codified in the Desk Guide, that applies to "[a]ny individual who is not a HASA client and continues to reside in the apartment/unit after the HASA client is no longer in residence." Desk Guide, ECF No. 104-2, at 14. The Desk Guide provides:

> Failure of the Provider to aggressively work toward rehousing non-HASA eligible individuals will result in a disallowance of any further payments on the apartment as of the sixth month following the death/departure of the HASA client.

---

defendants have not contested that HSI receives federal funding to operate its housing assistance program. Therefore, there is a "subtle distinction" that allows HSI to be held liable under the Rehabilitation Act while it cannot be held liable under the ADA. Henrietta D., 331 F.3d at 272; see also Logan v. Matveevskii, 57 F. Supp. 3d 234, 254 (S.D.N.Y. 2014) ("[O]ne of the primary differences between [the ADA and the Rehabilitation Act] is that the Rehabilitation Act applies only to federally-funded programs.").

- All efforts to rehouse individuals in this category must be clearly documented.

Provider must assist individual(s) to move, within six months of client's death/departure, either by
- having the lease assigned from the Provider's Program to the individual him/herself and find other means to pay the rent (e.g., PA shelter allowance); or
- seeking alternate housing at a rent the individual can afford.

Id. HSI argues that it provided the plaintiff with sufficient relocation assistance by providing the plaintiff, through AB, with a packet of information about housing and rental assistance including information on several rental assistance programs, and a note to the plaintiff to "Call [Stolfi] if you have any questions." Defs.' 56.1 ¶ 37. HSI also claims to have sent the plaintiff two letters, one of which contained a list of brokers, realtors, and landlords intended to help the plaintiff find a new apartment, and the other of which was returned as undelivered.

The plaintiff contests the sufficiency of HSI's efforts to provide her with relocation services, as required by the Desk Guide. First, the plaintiff argues that the housing assistance programs recommended by HSI were insufficient because the plaintiff was not eligible for those services. Second, the plaintiff claims that she called Stolfi for further help, but Stolfi did not return the plaintiff's calls nor respond to the plaintiff's voicemails. Pl.'s 56.1 ¶ 44. On a separate occasion,

18

the plaintiff also claims that Stolfi never returned her calls despite the plaintiff's having left "more than five" messages. Pl.'s 56.1 ¶ 53. Finally, the plaintiff challenges the method of delivery of the initial packet provided by HSI, because HSI left the packet with AB to give to the plaintiff despite knowing of the significant tension in the relationship between AB and the plaintiff.

The plaintiff also argues that HSI treated the plaintiff disparately relative to other similarly situated individuals. Specifically, the plaintiff claims that "HSI has failed to identify a single other instance where it began an eviction process against a family member on a HASA client's budget within even two months – let alone two weeks – as occurred here." Pl.'s Opp. at 19. Disparate treatment is an accepted theory of liability for Rehabilitation Act discrimination claims. See Davis v. Shah, 821 F.3d 231, 259-60 (2d Cir. 2016) ("A plaintiff may base her discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation."). The plaintiff points to evidence that other individuals who lived with a family member in HSI housing, and who did not otherwise qualify for HSI housing, were given "5 weeks' notice to vacate" and did not have holdover proceedings commenced against them "for five months," whereas the plaintiff was served with an eviction notice just

two weeks after AB moved out of the 132 Street Apartment and, within two months of being served with the eviction notice, HSI commenced holdover proceedings against the plaintiff. Pl.'s 56.1 ¶ 139. The factual dispute between the parties as to whether HSI's efforts to re-house the plaintiff were sufficient, compounded by evidence that other similarly situated individuals were not evicted with such rapidity, suffices to state the plaintiff's prima facie case. See Burris, 2019 WL 1244494, at *6 (finding, on the motion to dismiss in this case, that the plaintiff had satisfied her prima facie case by alleging that "she is qualified to receive the benefit of the HASA policy relating to relocation assistance but did not receive it because of her disability," and that "she was not provided a service to which she was entitled – a service that is provided to all individuals, disabled or not - because of her disability").

The burden then shifts to HSI to articulate a legitimate, non-discriminatory reason for the plaintiff's eviction and its allegedly insufficient efforts to re-house the plaintiff. The most obvious reason, and the one HSI articulates, is that the plaintiff was not entitled to remain in the 132 Street Apartment because she was not an HASA-eligible individual, and that HSI "provided the services it could" to the plaintiff. See Defs.' Memo. at 16. However, the plaintiff has adduced evidence that HSI accelerated the timeline for eviction in the plaintiff's

20

case relative to other similarly situated non-HASA eligible
individuals. Moreover, the plaintiff has contested the
sufficiency of HSI's efforts to re-house her, claiming that
Stolfi never returned any of the plaintiff's calls, despite
Stolfi's invitation, and that Stolfi did not give the initial
packet of housing assistance information directly to the
plaintiff. Although this evidence comprised the plaintiff's
prima facie case of intentional discrimination, the plaintiff
does not have to adduce additional information to defeat summary
judgment at the pretext stage, and may instead "rely on evidence
comprising her prima facie case." See Zann Kwan v. Andalex Grp.
LLC, 737 F.3d 834, 847 (2d Cir. 2013) (Title VII retaliation).
Given this evidence, a reasonable jury could conclude that HSI's
stated nondiscriminatory reasons for its decisions were
pretextual.

Ultimately, the question of whether HSI intentionally
discriminated against the plaintiff by inadequately helping the
plaintiff with housing relocation creates a genuine dispute of
material fact that precludes summary judgment for the defendants
on the plaintiff's Rehabilitation Act discrimination claim. A
reasonable jury could conclude that the defendants' efforts did
not satisfy sufficiently the requirement of the Desk Guide that
the defendants "aggressively work toward re-housing non-HASA
eligible individuals," and that the plaintiff was treated

disparately on the basis of her mental illness in receiving
HSI's rehousing services. Accordingly, HSI's motion for summary
judgment on the plaintiff's Rehabilitation Act intentional
discrimination claim is **denied**.

### C.

The FHA makes it illegal "[t]o discriminate against any
person in the terms, conditions, or privileges of sale or rental
of a dwelling, or in the provision of services or facilities in
connection with such dwelling, because of a handicap of . . .
that person." 42 U.S.C. § 3604(f)(2)(A). The FHA allows for
claims to be brought against individuals. See Burris, 2019 WL
1244494, at *7. The defendants argue that the plaintiff's FHA
intentional discrimination claim must be dismissed because
relocation services do not constitute "terms, conditions, or
privileges of rental" within the meaning of the FHA. On a motion
for summary judgment, intentional discrimination claims under
the FHA are also analyzed under the McDonnell Douglas framework.
See Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).

In its ruling on the defendants' motion to dismiss in this
case, the Court considered, and rejected, the defendants'
argument that the relocation services provided for in the Desk
Guide do not constitute "terms, conditions, or privileges of

rental." See Burris, 2019 WL 1244494, at *7.[3] The Court concluded

that "[h]olding otherwise . . . would contravene Congress's

intent to root out discrimination in housing and to foster truly

integrated and balanced living patterns." Id. On their motion

for summary judgment, the defendants make this argument again,

but have not brought any new cases to the Court's attention that

call into question the Court's prior determination on this

issue. The defendants state that "in no case we could locate has

a Court interpreted privileges, services, or facilities to refer

to case management services provided as part of a supportive

housing program." Defs.' Memo. at 10-11. But the defendants also

do not cite any cases which hold squarely that "terms,

conditions, or privileges of rental" do not encompass the

relocation services that are provided for by the Desk Guide in

---

[3] The opinion on the motion to dismiss in Burris relied on
Francis v. Kings Park Manor, Inc. ("Francis I"), 917 F.3d 109,
117-118 (2d Cir. 2019), which held that post-acquisition claims
– discrimination occurring after a plaintiff rents a dwelling –
are actionable under the FHA. Francis I was later vacated en
banc because of a separate issue in that case, distinct from
whether the FHA covered post-acquisition claims. See Francis v.
Kings Park Manor, Inc. ("Francis III"), 992 F.3d 67 (2d Cir.
2021). In Francis III, the majority opinion did not squarely
address whether, in light of the vacatur of Francis I, post-
acquisition claims remained actionable under the FHA. In a
concurrence in part and a dissent in part, Judge Lohier noted
that "[a]lthough the proposition that the FHA bans post-
acquisition discriminatory conduct in housing is beyond serious
dispute, the majority opinion merely assumes it," and that he
"would squarely hold that it does." Francis III, 992 F.3d at 87-
89 (Lohier, J., dissenting in part and concurring in part).

this case. Instead, the defendants argue only that "terms,
conditions, or privileges of rental" have been interpreted to
refer to "services generally provided by governmental units such
as police and fire protection or garbage collection," and to
"apartment complex facilities, such as the swimming pool,
laundry equipment, club house, tennis courts and other
recreational areas." Id. at 10. However, nothing about this
argument, nor the cases cited by the defendants, precludes
"terms, conditions, and privileges of rental" from also
encompassing relocation services. Accordingly, the defendants'
argument is unpersuasive, and there is no reason to find that
housing relocation services are not covered by the FHA because,
at the very least, a reasonable jury could conclude that such
services are covered under the FHA.

The defendants also argue that the plaintiff has not made
out a prima facie case for discrimination under the FHA. An FHA
claim of intentional discrimination can be brought under one of
three theories: disparate treatment, disparate impact, or
failure to make a reasonable accommodation. Perricone-Bernovich
v. Tohill, 843 F. App'x 419, 420 (2d Cir. 2021). The plaintiff
proceeds on a theory of disparate treatment.[4] To state a prima

---

[4] The plaintiff's FHA claim for failure to make a reasonable
accommodation was dismissed in this case on the earlier motion
to dismiss. See Burris, 2019 WL 1244494, at *8.

facie case for disparate treatment under the FHA, the plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified to rent or purchase the subject housing; (3) she was rejected; and (4) the housing opportunity remained available to other prospective renters or purchasers. Mitchell, 350 F.3d at 47. The defendants agree that, in the context of the plaintiff's claim, the test is modified and the plaintiff must show that: (1) she is a member of a protected class; (2) she sought and was qualified for assistance relocating; (3) she was denied that assistance; and (4) that assistance was available to other individuals after the death or departure of a HASA-client. Defs.' Memo. at 12.

The defendants do not contest the first two factors. See id. at 13 ("Assuming [the] [p]laintiff's mental illness makes her a member of a protected class and that the Desk Guide established that [she] was qualified for assistance relocating, . . . "). The defendants argue only that the plaintiff "cannot show [that] she was denied that assistance [relocating] or that the assistance she claims she was denied was available to others." Id.

Whether the defendants' efforts to assist the plaintiff with relocating after AB moved out of the 132 Street Apartment satisfied the requirement set forth in the Desk Guide that HSI "aggressively work toward re-housing non-HASA eligible

25

individuals," Desk Guide at 14, presents a genuine dispute of material fact mirroring the plaintiff's claim for discrimination under the Rehabilitation Act, and precluding summary judgment for the defendants on the plaintiff's FHA claim. The plaintiff has contested the sufficiency of the defendants' efforts to relocate her and has adduced evidence showing that the plaintiff experienced disparate treatment in comparison to HSI's efforts to re-house other non-HASA eligible family members. Moreover, a reasonable jury could conclude that any legitimate, non-discriminatory reason proffered by the defendants' for evicting the plaintiff in this case was pretextual given the evidence adduced by the plaintiff and the genuine issues of material fact created by the plaintiff's adduced evidence. Accordingly, for the same reasons that preclude summary judgment on the plaintiff's Rehabilitation Act discrimination claim, the defendants' motion for summary judgment on the plaintiff's FHA discrimination claim is **denied.**

### IV.

The defendants next move for summary judgment on the plaintiff's claims of retaliation in violation of the Rehabilitation Act and the FHA.

Retaliation claims under the Rehabilitation Act and the FHA are governed by the McDonnell Douglas burden-shifting framework. Dodd v. City Univ. of New York, 489 F. Supp. 3d 219, 246

(S.D.N.Y. 2020) (Rehabilitation Act); Johnson v. YWCA Residence, LLC, No. 12-cv-3301, 2014 WL 12782728, at *4 (S.D.N.Y. 2014) (FHA). The plaintiff bears the initial burden to make her prima facie case by showing that: (1) the plaintiff was engaged in protected activity; (2) the alleged retaliator knew that the plaintiff was involved in protected activity; (3) an adverse decision or course of action was taken against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action. Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (Rehabilitation Act); Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 53-54 (FHA).[5] A causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Natofsky, 921 F.3d at 353. The "plaintiff's burden at this prima facie stage is de minimis." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

---

[5] Because the two statutes are governed by identical tests, the Court will consider the plaintiff's retaliation claims under both statutes together.

On June 27, 2016, the plaintiff engaged in protected activity by filing the NYSDHR Complaint. HSI responded to the NYSDHR Complaint on August 3, 2016, by which time the defendants must have known of the charge of discrimination against them. Less than a month later, on August 30, 2016, HSI served the plaintiff with a "10-Day Notice to Vacate Premises," commencing eviction proceedings against the plaintiff. Defs.' 56.1 ¶ 45.

The defendants argue that commencing eviction proceedings against the plaintiff did not constitute an adverse action because HSI's conduct did not cause the plaintiff to "change her behavior" nor did it have any "chilling effect on [the] [p]laintiff's willingness to assert" her rights under the FHA or the Rehabilitation Act. Defs.' Memo. at 22. However, for purposes of retaliation, an adverse action is any action that would be sufficiently severe to deter a reasonable person in the plaintiff's position from participating in a protected activity. See Quadir v. N.Y. State Dep't of Labor, 39 F. Supp. 3d 528, 542-43 (S.D.N.Y 2014); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (holding, in the Title VII context, that an adverse action is one that "dissuade[s] a reasonable [individual] from making or supporting a charge of discrimination"). Beginning eviction proceedings within a month of the plaintiff's filing the NYSDHR Complaint is a sufficiently adverse action that would deter a reasonable person from

28

pursuing charges of discrimination. See Reyes v. Fairfield Props., 661 F. Supp. 2d 249, 267 n.10 (E.D.N.Y. 2009) (finding that eviction proceedings constituted adverse actions under the FHA); see also DeSouza v. Park West Apartments, Inc., No. 15-cv-1668, 2018 WL 2990099, at *11 (D. Conn. June 14, 2018) (collecting cases) ("[I]nitiation of eviction proceedings . . . constitute[s] [an] adverse action[] under [the FHA]."). At the very least, a reasonable jury could conclude that the eviction constituted an adverse action. Therefore, the argument that commencing eviction proceedings did not constitute an adverse action is unpersuasive.

To establish the causation element of her prima facie case, the plaintiff relies on the temporal proximity between the filing of the NYSDHR Complaint and the service of the 10-Day Notice to Vacate the 132 Street Apartment. "[A] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse . . . action." Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001). In this case, the adverse action occurred less than a month after the plaintiff's participation in a protected activity, which is "sufficient to establish the required causal link for a prima facie case." See Treglia, 313 F.3d at 721 (finding that temporal proximity of one month was

sufficient); Dodd, 489 F. Supp. 3d at 247 ("Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action."). In this case, the "very close" temporal proximity is sufficient to establish causation for the plaintiff's prima facie case.

Moreover, the defendants commenced eviction proceedings just under two weeks after August 18, 2016, when AB moved out of the 132 Street Apartment. Because the defendants had to wait until AB vacated the apartment before commencing eviction proceedings, the close temporal proximity between AB's departure from the 132 Street Apartment and the commencement of eviction proceedings against the plaintiff could lead a reasonable jury to conclude that "the adverse action occurred at the first actual opportunity to retaliate." Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013).

The defendants argue that the eviction could not have been retaliatory because the plaintiff was told that she could not remain in the 132 Street Apartment, and that eviction proceedings were the culmination of a series of events that began before the plaintiff engaged in protected activity. In the employment context, "courts have held that, where discipline began before an employee's protected activity and the employee's poor performance continued after the protected activity, the

continuation and even gradual escalation of discipline cannot support a retaliation claim." See, e.g., Europe v. Equinox Holdings, Inc., No. 20-cv-7787, 2022 WL 4124763, at *10 (S.D.N.Y. Sept. 9, 2022). However, this case is not an analogous situation. In this case, the plaintiff had no warning that the defendants would begin eviction proceedings against her just two weeks after AB moved out of the apartment, unlike in Europe where an employee with a documented record of lateness, and who was formally disciplined several times, was eventually fired. See id.

Given the plaintiff's prima facie case, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for commencing eviction. The defendants claim that "HSI and [Stolfi] believed that [the] [p]laintiff was intent on remaining in the unit, and that it was their duty to free up the spot in the HASA scatter-site housing program for a HASA-eligible client." Defs.' Memo. at 20.

While it is true that the plaintiff was not eligible for the 132 Street Apartment, and that HRA "advised HSI of its expectation" that HSI would act to evict non-HASA clients after the departure of an HASA client from an apartment if the family members of that client "do not demonstrate an intention to vacate the unit," Defs. 56.1 ¶ 83, the plaintiff has also adduced evidence that the defendants had not moved to evict

31

other similarly situated individuals with such rapidity. Other
similarly situated HASA-ineligible individuals were given "5
weeks' notice to vacate" and did not have holdover proceedings
commenced against them "for five months." Pl.'s 56.1 ¶ 139. In
contrast, the plaintiff was served with an eviction notice less
than a month after she filed the NYSDHR Complaint and just 2
weeks after AB moved out of the 132 Street Apartment, and the
defendants commenced holdover proceedings against the plaintiff
within two months after serving the eviction notice. Although
"temporal proximity alone is insufficient to defeat summary
judgment at the pretext stage," Zann Kwan, 737 F.3d at 847, the
combination of the short temporal proximity and the additional
circumstantial evidence of the defendants' not serving notices
of eviction on other such similarly situated non-HASA eligible
individuals with such rapidity is sufficient to raise a question
of pretext that would preclude summary judgment. See Graham v.
Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000) (finding, in
the employment context, that "[a] showing that similarly
situated employees . . . received more favorable treatment can
also serve as evidence that the employer's proffered legitimate,
non-discriminatory reason for the adverse job action was a
pretext for . . . discrimination"); see also Osekavage v. Sam's
East, Inc., No. 19-cv-11778, 2022 WL 3084320, at *10 (S.D.N.Y.
Aug. 3, 2022) ("[The] [p]laintiff has, in addition to

establishing temporal proximity, offered evidence of disparate
treatment — evidence from which a reasonable jury could infer
that the reasons proffered by [the] [d]efendants were a pretext
for a retaliatory motivation.").[6]

Moreover, there remain factual disputes as to whether the
defendants complied sufficiently with their obligations,
pursuant to the Desk Guide, to provide the plaintiff with
relocation assistance. "The Court's role, at the summary
judgment stage, is not to weigh evidence." Dodd, 489 F. Supp. 3d
at 261. Instead, "the Court's role is only to determine whether
there is a genuine issue for trial." Id. In light of these
factual disputes, a reasonable jury could conclude that the
defendants' proffered nondiscriminatory reason for evicting the
plaintiff was pretextual. Accordingly, the defendants' motion
for summary judgment on the plaintiff's retaliation claims under
the Rehabilitation Act and the FHA is **denied**.

---

[6] Graham and Osekavage both analyzed pretext in the Title
VII context. However, the principles underlying a finding of
pretext remain consistent, whether under Title VII, the
Rehabilitation Act, or the FHA, because the statutes are
analyzed under similar standards. See, e.g., Pistello v. Bd. of
Educ. of Canastota Cent. Sch. Dist., 808 F. App'x 19, 21-22 (2d
Cir. 2020) (analyzing together retaliation claims under Title
VII and the Rehabilitation Act); Reg'l Econ. Cmty. Action
Program, 294 F.3d at 53-55 (2d Cir. 2002) (analyzing together
retaliation claims under the Rehabilitation Act and the FHA).

## CONCLUSION

The Court has considered all the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion for summary judgment is **granted in part and denied in part.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:     New York, New York
           February 13, 2023

                                   _____
                                        John G. Koeltl
                                   United States District Judge